FORT WORTH AND DENVER RAILWAY COMPANY, Appellant,

v.

Harold W. COFFMAN, Appellee.

No. 16671.

Court of Civil Appeals of Texas.

Fort Worth.

Dec. 3, 1965.

Rehearing Denied Jan. 7, 1966.

Tilley, Hyder & Law, Fort Worth, Friberg & Parish, Wichita Falls, Touchstone & Sampels and M. D. Sampels, Dallas, for appellant.

Rumph, Ivy & Karpenko, Fort Worth, Philip S. Kouri, Wichita Falls, Helm, Jones & Pletcher, and George E. Pletcher, Houston, for appellee.

RENFRO, Justice.

Plaintiff, Harold W. Coffman, in an action arising under the Federal Employers' Liability Act, recovered a verdict and judgment in the amount of $160,000 from the Fort Worth and Denver Railway Company.

Evidence was introduced by and for plaintiff that he was injured on February 18, 1961, when the caboose in which he was riding derailed. On that date he, a freight conductor, was advised by supervisors that he and his crew were "doubling back" to Wichita Falls from Fort Worth with a train which was already made up. A brakeman noticed a car he considered unsafe for the run. Plaintiff inspected the car, saw that the drawbar had been worked on and was not in a normal position. The drawbar pointed downward instead of being parallel, its normal position. Four new bolts were in place. Plaintiff reported to the inspector. The car inspector said the car had been "bad-ordered", placed on the "rip track", repaired and okayed and was safe to move. Plaintiff then informed the yard master the car was not safe. The yard master told him the car had been repaired and okayed by him and said: "You are taking it—you are moving it." There were 122 cars in the train. The car in question was placed last except for the caboose. After the train had traveled approximately 49 miles, "all of a sudden the car in question parted from the train and it derailed the front end of the caboose. * * * it was a terrific impact." Just prior to the derailment there was a thud, or loud noise under the caboose as if something had hit under it. The draw works had fallen off the front end of the defective car. After derailment it was still coupled with the caboose. After the car and the caboose came to a stop the drawbar on the defective car was completely gone; all the draw works were gone, the front end of it was setting up on the drawbar of the car ahead.

The jury found in answer to special issues Nos. 1 and 2 that defendant failed to furnish plaintiff a reasonably safe place to work, and such failure was a proximate cause of the occurrence; and in answer to issues Nos. 3 and 4 defendant failed to furnish plaintiff safe equipment and such failure was a proximate cause. In issues Nos. 7 and 8 the jury found that defendant failed to make such repair on the car as would have been made by a person of ordinary prudence in the exercise of ordinary care under the same or similar circumstances, and such failure was a proximate cause. It was also found that the occurrence was not the result of an unavoidable accident.

Defendant contends the court erred in refusing to instruct a verdict against plaintiff, and in refusing to hold as a matter of law that plaintiff was negligent.

The jury acquitted plaintiff of contributory negligence. It found for plaintiff on issues inquiring as to defendant's conduct.

■ The Federal Courts have broadened the jury's function in F.E.L.A. cases so that very little evidence is required to uphold a jury verdict of negligence. Bailey v. Central Vermont Ry., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444; Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Deen v. Gulf, Colorado & Santa Fe Railway Co., 353 U.S. 925, 77 S.Ct. 715, 1 L.Ed.2d 721.

■ Under the above authorities we hold the evidence sufficient to support the verdict and judgment.

■ Defendant urges reversal because the verdict did not contain any findings

of negligence in support thereof and was not supported by the pleadings.

The court charged the jury that the term "reasonably safe place to work" is such a place as an ordinarily prudent railroad company would have furnished its employees under the same or similar circumstances.

The jury found that defendant failed to furnish plaintiff a reasonably safe place in which to do his work, and that such failure was a proximate cause of the occurrence made the basis of the lawsuit.

The jury also found that the defendant failed to furnish plaintiff safe equipment with which to do his work, and such failure was a proximate cause of the occurrence.

Similar objections were made to the charge and like points of error were urged in Texas & New Orleans Railroad Company v. Arnold, 381 S.W.2d 388 (Beaumont Civ.App., 1964). In its opinion the court said: "The points are without merit. * * It has been consistently held that the standards or customs of a particular enterprise might themselves be negligent because they did not rise to the standard of the ordinarily prudent person. Ordinary care may be something above and beyond the customs and standards ordinarily incident to the organization or a given business. * * * Since the jury was required to measure the conduct of appellant in respect to the railroad industry, it is in no position to complain. If it exercised less care than was exercised by reasonably prudent railroad companies, it was guilty of negligence. That similar instructions have not been found erroneous see Taylor v. White, 212 S.W. 656 (Com.App. 1919, judg. adopted); Texas Coca-Cola Bottling Co. v. Kubena, 109 S.W.2d 1098 (n.w.h. Civ.App. 1937); Houston & T. C. R. Co. v. Alexander, 103 Tex. 594, 132 S.W. 119 (1910); San Antonio St. Ry. Co. v. Caillonette, 79 Tex. 341, 15 S.W. 390 (1891); Great Atlantic & Pacific Tea Co. v. Evans, 142 Tex. 1, 175 S.W.2d 249 (1943)."

The Supreme Court dismissed the appeal in the above case because the Railroad had not timely perfected its appeal to the Court of Civil Appeals. Texas & New Orleans Railroad Co. v. Arnold, Tex., 388 S.W.2d 181. In the majority opinion, however, it was stated: "Railroad, petitioner here, urges a reversal because the trial court submitted two issues too broadly, improperly defined the term 'suitable equipment,' * * *. We are inclined to the view that these points would not require a reversal, * * *." In a dissenting opinion (as to timely appeal), Justice Greenhill agreed with the majority on the proper submission of the attacked issues. Said he, "I would affirm the judgments of the courts below. Under the broad holdings of the Supreme Court of the United States in F. E. L. A. cases, the jury issues with regard to the railroad's failure to furnish suitable equipment to the plaintiff, answered by the jury favorably to the plaintiff, will support the judgment for the plaintiff."

The points of error are overruled.

■ Defendant contends the court erred in allowing Dr. King to testify concerning plaintiff's history.

While testifying Dr. King was asked: "* * * your testimony here is based on your findings and examination and treatment rather than on the history?" He answered, "That is true." It was also shown that when plaintiff first went to Dr. King (3–22–61) he was given some treatment. In testifying as to his expenses, charges, etc., for time spent in court, x-rays for plaintiff, office calls and examinations, he was asked, "That, of course, includes all treatment?" The doctor answered, "Oh, yes, that includes the total."

The evidence is sufficient to show that plaintiff went to Dr. King, not merely for an examination but for the purpose of diagnosis and treatment.

■ The opinion of a physician or surgeon as to the condition of an injured or

deceased person is not rendered incompetent by the fact that it is based upon the history of the case given by the patient to the physician or surgeon on his examination of the patient, when the examination was made for the purpose of the treatment and care of the patient. Federal Underwriters Exchange v. Carroll, 130 S.W.2d 1101 (Beaumont Civ.App., 1939, no writ hist.); Missouri, K. & T. Ry. Co. of Texas v. Rose, 19 Tex.Civ.App. 470, 49 S.W. 133, (1898, ref.); Texas General Indemnity Co. v. McNeill, 261 S.W.2d 378 (Beaumont Civ.App., 1953, no writ hist.); Austin Road Company v. Thompson, 275 S.W.2d 521 (Fort Worth Civ.App., 1955, ref., n. r. e.).

Defendant argues that issue No. 7, as framed, is a comment by the court on the weight of the evidence. In view of the undisputed evidence as to what was seen, said and heard in defendant's yards at Fort Worth, we think the issue was not a comment on the weight of the evidence.

In any event the judgment is amply supported by other issues which we hold were properly submitted.

In other points the defendant contends the verdict was so excessive the trial court should have granted a new trial or granted a remittitur.

At the time of the accident plaintiff was 49 years of age and was earning about $9,000 per year. The accident occurred on February 18, 1961.

Plaintiff started to work for defendant in 1936 cleaning coaches. Since that time he had no other employer. He was promoted to conductor in 1943, and continued as a conductor until December, 1963. During the years preceding the accident in question he lost a total of 14 days because of slight injuries. He had regular physical examinations throughout his period of employment with defendant and was always found fit for duty. Soon after the derailment plaintiff lost consciousness and remained unconscious until sometime the next day. He was in a hospital in Wichita Falls from February 19 until March 1, then sent to a hospital in Fort Worth for 2½ days, then returned home. He continued to take treatment but returned to work in April. After resuming work he had headaches, his balance was bad and he suffered from dizziness. He transferred to a job in Fort Worth (same employer) where the hours on duty were longer and the pay better, because there were more frequent rest periods. In December of 1963, because his train had run through and torn up a switch, he was called in for an investigation and told he would not work until he had a medical examination. He reported to the doctors to whom he had been directed. He never returned to work. He was asked why he was unable to work and answered, "Well, as a conductor * * * I am responsible not only for the people I work with but the public as well and in my condition, I just couldn't return to work knowing what could happen to the people I work with and the public and to myself, if I was to be placed in responsibility of the train."

Since the accident he has lost 30 pounds. He cannot keep his balance. He cannot walk normally. After the accident he resigned an office with the Brotherhood Railroad Trainmen because he could not keep up with the work. As of the date of trial he was still taking treatments. He did not think he was getting any better.

Fellow railroad workers testified that before the accident plaintiff was a robust, capable workman, that after the accident his physical actions and general conduct as a conductor deteriorated to the point other crew members had to help him with his duties, and, in December, 1963, one of them felt compelled, for the safety of all concerned, to report him to superiors.

Several witnesses testified plaintiff dragged his right foot, and one saw him "Standing dead still and just fall back just like he had passed out."

Evidence showed he could not sleep and was quite restless and irritable. He had frequent severe headaches.

Dr. King testified: He first saw plaintiff March 22, 1961. Plaintiff was confused with obvious mental disturbances. Hyperflexion of the head caused a marked amount of muscle spasm. He saw plaintiff again on April 4, 1961. Plaintiff apparently was in about the same condition. The witness prescribed analgesics for headaches. He next saw plaintiff April 29, 1964. On that occasion plaintiff had mental disturbances and dragged both feet. In his opinion plaintiff suffered a serious brain concussion, and " * * * it is one that is going to render him permanently disabled in this way, that he will permanently have this loss of coordination and he will have headaches; he will have dizziness and he will not be able to carry on gainful occupation and particularly anything to do with his former occupation." Plaintiff will have headaches, dizziness, buzzing in his ears the rest of his life. He will continue to have memory disturbances. He will not be able to carry on any remunerative type of work. His condition resulted from the accident. The witness concluded, "My opinion is that he is permanently and totally disabled."

Dr. Gardiner, medical doctor specializing in psychiatry, by deposition testified: He first saw plaintiff for examination and treatment on January 23, 1963. Plaintiff had a type of tension disturbance which the witness called a depression. Plaintiff returned for treatment at two week intervals for sometime. Plaintiff continued to have headaches. By June, witness was discouraged as to plaintiff's total response. He continued treatments until December. Plaintiff was somewhat better but did not show a great deal of improvement. Shock treatment was warranted and was administered by the witness until plaintiff had received twelve treatments. The doctor did not see as favorable response as he had hoped for. Plaintiff understates rather than emphasizes his complaints. The witness, noting plaintiff had not shown much improvement, considered that fact to be rather significantly disabling to plaintiff. In his opinion, plaintiff had reached a maximum improvement. He had a guarded opinion as to whether plaintiff's condition was permanent or temporary, but plaintiff had not shown a favorable response. The plaintiff "is not now able to perform the duties" of switchman, brakeman or conductor. Plaintiff's condition is due to the injury sustained in the derailment accident.

The issue on damages was accompanied by proper instructions.

■ Although the verdict is large and the trial court, in the exercise of a sound discretion, might properly have set it aside, the appellate court will not disturb the verdict, although it may seem too large, in the absence of circumstances tending to show that it was the result of passion, prejudice, or other improper motive, or that the amount fixed was not the result of a deliberate and conscientious conviction in the minds of the jury and court, or so excessive as to shock a sense of justice in the minds of the appellate court. 17 Tex.Jur.2d 415, § 341; Fort Worth & Denver City Ry. Co. v. Gifford, 252 S.W.2d 204 (Fort Worth Civ.App., 1952, no writ hist.).

■ In view of the record we cannot say that the verdict was so excessive as to require a new trial, or a remittitur.

The points are overruled.

Seven points of error are based on alleged improper jury argument.

Referring to defendant's counsel who made the closing argument for defendant, plaintiff's counsel said: "His whole argument has been pitched on one thing, an abject appeal to bias and prejudice and an out and out claim to you twelve folks that everybody is out of step in this case except Mr. Parish. Even Mr. Friberg, when he spoke to you, did not in any way, shape or form, attempt to convey the impression to you twelve folks, not just Harold Coffman is a thief, a fraud, a fake; that Dr. King is either incompetent or a perjurer; that Dr. * * * psychiatrist is of the same cut—."

Defendant objected, "I want to object to his saying that I inferred that Dr. King was a perjurer; I did not."

Plaintiff's attorney continued: "That Lillard Jackson would lie for Harold Coffman; that Mr. Ausland would come up here and take an oath to his God and again assist, aid and abet a fraud on this jury—."

Defendant objected, remarking that he never mentioned Ausland in his speech.

Counsel continued by stating, in substance, that defendant's counsel wanted the jury to believe that plaintiff, the doctors, friends and the attorneys had all joined hands to perpetrate a fraud.

Other statements of plaintiff's counsel are set forth in the brief, but they obviously were not erroneous so will not be repeated.

In the closing argument by defendant's counsel he had stated: "And then we find him (plaintiff) for some strange reason down in Houston; he is up talking to some lawyers and these lawyers say, you've been to six doctors already, let's try another, and they send to Dr. Keither Bradford. * * * Then we find him coming back up to Fort Worth to another lawyer's office and this lawyer sends him to Dr. Gardiner. * * * Was it decided before this lawsuit was filed that this man would not work in '64 and would come in before this jury and say that he would never be able to work again? * * * and Coffman can't substantiate $227,000 if he goes back to work; so he doesn't go back to work. * * * (Referring to Dr. King) He wasn't only a witness, he was an advocate in behalf of the bill of goods he was attempting to sell. * * * (Further, referring to 'they') are going to sell the jury on a bill of goods that he won't work any more for the rest of his life. God help our jury system if you let them sell you that bill of goods! * * * But back in February, when he was working fourteen and fifteen hours a day, a bunch of lawyers decided that he would be disabled for the rest of his life."

It is apparent plaintiff's argument, of which complaint was made, was in reply to defendant's argument. He was entitled to make a vigorous reply.

The argument was somewhat intemperate and should not have been made as it was.

■ The Supreme Court has held, however, that jury argument is to be tested by Rules 434 and 503, Texas Rules of Civil Procedure. Therefore, before a judgment is reversed because of argument of counsel, two things must appear: the argument must be improper, and it must be such as to satisfy the reviewing court that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. Aultman v. Dallas Railway & Terminal Co., 152 Tex. 509, 260 S.W.2d 596 (1953).

■ In this case the defendant introduced no witness to testify in rebuttal to plaintiff's evidence as to the accident and its cause or causes and introduced no doctor or other witness to contradict the evidence as to plaintiff's physical and mental condition. In fact, defendant introduced no witnesses at the trial.

We have given careful consideration to the whole record. Considering the argument by plaintiff's attorney of which complaint is made, along with his whole argument and the argument of opposing counsel, and considering the record as a whole, we cannot say the argument was such as was reasonably calculated to cause and did cause the rendition of an improper judgment.

When the argument is considered in continuity, it is obvious plaintiff's attorney was speaking in reply to opposing counsel's charges.

In our view, in the light of the record, no juror of ordinary intelligence could have been persuaded by the argument to agree to a verdict contrary to that to which he would have agreed but for such argu-

ment. Goforth v. Alvey, 153 Tex. 449, 271 S.W.2d 404 (1954).

Other points are based on the court's ruling on admission of evidence. We find no reversible error.

All of defendant's points of error have been carefully considered, and having found no reversible error in any of them, separately or cumulatively, each and all are overruled and the judgment of the trial court is affirmed.

Affirmed.